Filed 3/9/21  P. v. Clark CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER MICHAEL CLARK,<br><br>Defendant and Appellant. | F078444<br><br>(Super. Ct. No. CRF54600)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tuolumne County.  James A. Boscoe, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

During a lengthy altercation, Christopher Michael Clark repeatedly choked and hit his wife and told her she was going to die. She escaped through a window of their apartment, and Clark thereafter barricaded himself inside for approximately eight hours until he was forcibly removed by Tuolumne County sheriff's deputies. At the time, Clark had two prior convictions for domestic violence offenses involving his former wife.

A jury convicted Clark of premeditated attempted murder (Pen Code,[1] §§ 664, 187, subd. (a), 189; count 1), corporal injury on a spouse after having suffered two prior convictions for the same offense (§ 273.5, subds. (a), (f)(1); count 2), criminal threats (§ 422; count 3), false imprisonment (§ 236; count 4), and resisting an officer by threats or violence (§ 69; count 5). As to counts 1, 2, and 4, the jury found Clark had personally inflicted great bodily injury. (§ 12022.7, subd. (e).)

The court sentenced Clark to an aggregate term of seven years to life plus 12 years. On count 1, the court sentenced Clark to a term of seven years to life. On count 2, the court sentenced Clark to a term of five years, plus five years for the great bodily injury enhancement. On each of counts 3 through 5, the court sentenced Clark to consecutive terms of eight months.

On appeal, Clark contends the court erred in instructing the jury with CALCRIM No. 361, Failure to Explain or Deny Adverse Evidence, and that counsel was ineffective in failing to request a jury instruction on voluntary intoxication. He additionally contends his sentence on count 2 must be stayed pursuant to section 654, and his sentence on count 1 must be corrected to reflect a term of life with the possibility of parole.

---

[1]     Undesignated statutory references are to the Penal Code, unless otherwise indicated.

We will remand with instructions for the court to correct the abstract of judgment to reflect Clark is sentenced on count 1 to a term of life with the possibility of parole. We reject Clark's remaining contentions and otherwise affirm.

**FACTS**

*I.*     ***Clark's Prior History of Domestic Violence***

Clark was in a relationship with B.C. from 2000 to 2012. They had two sons. The relationship was tumultuous and frequently involved drinking and violence inflicted by both parties.

On August 21, 2011, Clark threw a pocketknife at the floor near B.C.'s feet and said something about stabbing her in the neck. The next day, B.C. came home later than usual and Clark accused her of cheating. He threw a coffee maker at her and hit her in the shin. Clark had been drinking and was not in his right mind. When B.C. called 911, Clark tried to take the phone from her. They struggled, and B.C. received scrapes inside her hands and wrists, as well as a broken nail. Once she reached the dispatcher, Clark said, "You're dead," and dragged his hand across his throat. Officers responded and B.C. told them what had occurred. The incident resulted in a court case and Clark spent approximately 30 days in custody.

Thereafter, B.C. and Clark separated, but eventually got back together. Although at first they were not drinking, they eventually started drinking again and "got in a bad place." During this time, Clark punched and kicked B.C. in the stomach and in the chest.

On February 22, 2012, B.C. called 911 again regarding another altercation. Clark told B.C. that, if she left, he would find her and kill her. B.C. gathered her purse, her children, and her cat, and told Clark she was going to get ice cream. Instead, she walked to a corner store and used the phone there to call her family. Her father and brother picked her up. When police arrived, they took photos of visible bruises on B.C.'s arms

3.

that were inflicted by Clark. Clark was arrested. After this incident, B.C. ended her relationship with Clark.

B.C. suffered theft-related convictions in 2013 and 2015. In 2017, she was arrested for battery against her fiancé and pled guilty.

## II. *Abuse of A.D.*

A.D. had three children from a previous relationship and shared custody with their father. She met Clark through an online dating website on July 2, 2017. A.D. had her own three bedroom apartment, and Clark moved in approximately seven days after they met.

Clark first hit A.D. in August 2017, when they had an argument and he slapped her hard enough to cause her to fall forward onto the couch. A.D. ran into the bathroom crying and used her phone to take a picture of herself that showed redness on the left side of her face and neck consistent with being slapped. In late August 2017, Clark threatened A.D. with a switchblade. She tried to back away and fell down and hit her right hip on the bed frame. She did not immediately tell anyone about either incident. Clark was drinking during both incidents.

On one occasion when A.D. and Clark had a falling out, A.D. spent the night at the home of her former fiancé, Anthony G. She told Anthony about some of the instances of violence by Clark. She later came home and worked things out with Clark.

Clark and A.D. fought all the time. Clark once told A.D. during a fight that if he wanted to kill her, she would be dead. He also told her he was an Army Ranger, and he had an Army Ranger sticker on his car.

On October 2, 2017, A.D. married Clark. Two days later, Clark threw a sweatshirt A.D. had from Anthony into the bathtub and lit it on fire.

On October 11, 2017, A.D. decided she no longer wanted to be in a relationship with Clark and she told him so by text message in the morning. Clark was home when

she arrived there later in the evening.  She told him she didn't want to be married to him, and she took off her ring and put it on the counter.  Clark got angry and took her purse and locked himself in the bathroom.  She knocked on the door to try to get her purse back, and Clark responded, "Leave me the fuck alone."  Her wallet and car keys were in her purse, so she had no way to drive away.  She texted Anthony to tell him that Clark was acting very strange and they were fighting.

A.D. called 911.  When deputies arrived, Clark was still locked in the bathroom.  The deputies talked to Clark through the door and convinced him to come out and give A.D. her things.  They would not make Clark leave, so A.D. left.  While she was out, Clark texted her, " 'You're out being a whore.' "  A.D. told him she would come home to prove she was not doing anything.  A.D. felt like she didn't have anywhere else to go.

A.D. arrived home around 9:00 p.m.  Clark became emotional and started crying. A.D. left the house again to get something to eat.  She returned home again around 10:00 p.m.  Around midnight, A.D. tried to go to bed in the bedroom while Clark was in the living room.  However, Clark kept coming in, turning on the lights, and slamming things around.  Eventually, around 1:30 a.m., A.D. went into her son's room to sleep in one of two twin beds.  Clark came into the room, knelt by the bed and tried to talk to her.  A.D. told him to leave her alone.  Clark left the room, then came back a while later and got in bed behind her.

Clark was angry and wanted to work on the relationship, but A.D. kept telling him no.  Clark asked, " 'Is that your final answer?' "  A.D. responded that it was.  Clark then rolled A.D. over, grabbed her throat with his left hand, and said, " 'You're going to fucking die tonight.' "  A.D. couldn't breathe and tried to fight back.  Clark kept his hands on her neck for five to 10 seconds.  He then grabbed A.D.'s hair and punched her in the face several times.  He grabbed her by her hair and slammed her head into the closet door.  He got behind A.D. and put his arm around her throat in a " 'choke hold.' "

A.D. had trouble breathing. Clark said, " 'I'm going to kill you.' " A.D. fell to the ground between the bed and the wall. She repeatedly asked Clark to stop. Clark grabbed A.D.'s throat again with his hand and she was unable to breathe for approximately 10 seconds. Clark then left the room briefly.

A.D. removed her hooded sweatshirt because it was bloody and she also didn't want Clark to choke her with the hood. She tried to make it to the window but Clark came back into the room. He grabbed A.D. by the hair, punched her in the face, and threw her onto a bedpost on her stomach. A.D. told him, " 'I love you, I'm sorry, I don't mean this.' " As they wrestled, A.D. begged him to stop and he let go. Clark saw A.D.'s phone on the ground and started hitting it against the bedpost.

Over the course of the attack, Clark told A.D. he was going to kill her or that she was going to die approximately three to four times.

Eventually, Clark left the room with A.D.'s phone. A.D. ran to her room to get a shirt and she saw Clark standing by the kitchen looking at her phone. She ran back to the children's bedroom, opened the window and jumped out.[2] A.D. ran upstairs and into a neighbor's apartment. She said, " 'Help me, help me,' " until someone came out. One of the occupants of the apartment called 911. A.D. estimated the attack lasted 45 minutes.

At approximately 7:00 a.m., Clark used A.D.'s phone to send Anthony a picture of his left hand with a bloody knuckle.

Deputies responded and found A.D. to be badly injured with her hair completely red from blood. A.D. was taken by ambulance to the hospital, where she remained for about a day. A.D. had a fractured left cheek, right cheek, and nose. Both of her eyes were bloodshot and red. She had marks on her neck from Clark strangling her. She had to get five stitches in one location and six stitches in another location along her scalp. She had an injured right elbow, a visible injury on her stomach from the bedpost, and

_____

[2] The apartment was on the ground floor.

injuries to her knees.  She had a broken rib that took about a month to heal.  She had to go back to the hospital after she was discharged due to difficulty breathing because of her injured ribs, and difficulty walking on her left foot.

### III.    The Standoff

Tuolumne County sheriff's deputies attempted to contact Clark at the apartment but he refused to answer the door.  Instead, he began moving furniture and hanging blankets on the windows and sliding glass doors.  The deputies repeatedly ordered Clark to come out, but he did not respond.  Clark looked out the windows several times.  A deputy saw Clark through the window, holding a rag and a bottle of bleach and wiping blood off the blinds.

The Special Weapons and Tactics (SWAT) Team and Crisis Negotiation Team were notified and arrived on scene.  The rest of the building was evacuated.  Eventually, the SWAT Team shot out the windows of the apartment and pulled the sheets and blankets off the windows.  At some point during the encounter, the fire alarm sounded and the apartment's sprinklers were activated, causing water to flow out the door.

Eventually, officers fired "Ferret rounds" containing a chemical irritant into the apartment.  However, Clark still did not exit, and the officers fired two cannisters of CS gas into the apartment.  Clark still did not exit the apartment.  The officers then took out additional windows and saw that a hallway door was closed.  They then fired "Ferret rounds" directly into the closed room and Clark exited the room.  He was naked and again refused to exit the apartment.

Officers could see Clark moving around the apartment.  Detective Daniel Newman observed Clark through the window of the master bedroom, which no longer had glass or a window covering, and ordered him to come outside.  Clark was naked and argued that he wanted to get clothes on.  Newman advised Clark he would be shot with a less than lethal round if he didn't comply.  Clark stated, " 'Well, if you're going to shoot me, then

7.

just go ahead and shoot me.' " Newman then deployed a 40-millimeter sponge round at Clark's waistband area.

Simultaneously, a four-man team entered the apartment. Sergeant Cuellar led the team and used a shield to pin Clark to a dresser in the corner of the room. Clark flailed his arms as Deputy John Hammell attempted to gain control of him. Clark struck Hammell's gas mask, causing it to slide from his face and causing Hammell to feel the effects of the chemical agents that had been deployed in the apartment. Cuellar grabbed Clark and turned him onto an upside down box spring. Clark grabbed a wooden piece of the box spring and refused to let go. He kicked his feet and struck Hammell twice. Hammell struck Clark with his fist and knee. At that point, Clark let go of the box spring and was handcuffed. He went limp and refused to move. Cuellar and Hammell grabbed Clark under his elbows and armpits and moved him down the hallway. At one point, Clark tensed up and then made an aggressive movement "with his whole body toward Deputy Cuellar's kind of legs and knee and kind of groin area." Cuellar looked pained, gritted his teeth, his eyes got big, and his face looked panicked. Other deputies assisted to get Clark off of Cuellar and moved Clark the rest of the way down the hallway.

Approximately eight hours passed between deputies arriving at the apartment and Clark being removed from the apartment.

Inside the apartment, deputies found blood on a mattress and on the blinds in the children's bedroom. They also found a bottle of bleach.

The parties stipulated that Clark joined the Army on February 22, 1995, and completed airborne training on July 14, 1995. He was assigned to Headquarters Company at Fort Bragg, North Carolina, as a private first class, and he received one year of credible service. On March 18, 1998, Clark was discharged under other than honorable conditions.

## IV.    *Defense Case*

Clark testified that, on the night of the incident, he was drinking tequila and vodka.  He estimated that he drank "close to a gallon" of liquor on and off throughout the night.  He also was smoking concentrated cannabis and had taken prescription Zoloft, trazodone, Wellbutrin, Ativan, and "a handful" of Norcos.  One of the medications, either Wellbutrin or Ativan, he had only begun taking the week before.  He took all of these substances because he was "emotionally hurt and distraught about an ongoing situation that [he] was having with [his] wife."

When he went into the children's room, Clark noticed A.D. was on her phone.  He asked what she was doing and she didn't answer.  He asked to see her phone and she wouldn't let him.  They started arguing about their relationship.  Clark asked if "this was it, and like after being married just a week earlier, if [their] relationship was going to be over."  She said yes, and Clark called her names.

Clark confronted A.D. about her ring and she got upset and hit him.  She hit him again and he put his arms out to push her away and hit her.

Clark admitted that he punched, grabbed, and hurt A.D.  He denied attempting to kill her or telling her he was going to kill her.  He explained he didn't have any "thought process" and was just lashing out.  He "was hurt inside and [he] wanted her to feel [his] hurt for everything that [he] had been put through."

Clark testified that he saw A.D. after she retrieved a shirt and before she climbed out the window.  He did not try to stop her from leaving.

Clark claimed he did not hear the sheriff's deputies when they came to the door of the apartment.  Eventually, he became aware they were there and they called him on his cell phone.  He didn't come out because he was scared and not thinking right.  He was still drinking alcohol.  He denied barricading the doors or windows, and explained that he moved the couch slightly to keep his pit bull from going to the sliding door.  He denied

9.

setting off the sprinkler system in the apartment. He described being shot by a less than lethal round, then being hit by something hard and black after officers came into the apartment, and stated he did not recall much else. He did not recall resisting officers when they entered the apartment.

**DISCUSSION**

## I. *CALCRIM No. 361*

Clark argues the trial court erred in instructing the jury with CALCRIM No. 361, Failure to Explain or Deny Adverse Evidence, and defense counsel was constitutionally ineffective in failing to object to the instruction. He additionally argues the instruction violated his state and federal constitutional rights to due process and trial by jury, and that reversal is required. The People argue any error in giving the instruction was harmless and Clark therefore has not established ineffective assistance of counsel. We agree with the People that any error in giving the instruction was harmless and Clark therefore has not established ineffective assistance of counsel.

### A. Additional Factual Background

The parties discussed jury instructions at two points during the presentation of the People's case, and the issue of whether CALCRIM No. 361 should be given was reserved until after Clark's testimony, should he choose to testify. After Clark's testimony concluded, the court immediately proceeded to instruct the jury. When the court arrived at the instruction based on CALCRIM No. 361, the court stated, "361 I don't think should be given." At sidebar, the prosecutor stated Clark didn't explain "wiping the blood off the blinds, he didn't explain prior domestic violence. I think there's a number of things that he didn't explain or deny, and I think the jury should be allowed to consider that." Defense counsel submitted, and the court instructed the jury as follows:

> "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that

10.

evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove the defendant guilty beyond a reasonable doubt.

"If the defendant failed to explain or deny, it's up to you to decide the meaning and importance of that failure."

The prosecutor referred to the instruction during closing argument:

"Now, there's a jury instruction about failure to explain or deny adverse testimony.  And it says if the defendant fails in his testimony to explain or deny evidence against him, you may consider his failure when you're looking at the evidence, right.  So if somebody like the defendant chooses to get up on the stand and say, okay, I did this, but I didn't do this, if they don't explain or deny allegations against them, you can use that to consider okay, do I believe this person.

"Did he comment about cleaning blood off the blinds with bleach, actually destroying evidence?  Why would somebody destroy evidence?  Because they're trying to get it away, it's consciousness of guilt, and that's another jury instruction.  So if you are trying to destroy evidence, you know that you did something wrong.  Why wouldn't he admit to that?  Because it makes him look bad.

"Prior evidence against [B.C.], he didn't talk about that at all except when I asked him, but you -- you know, you were convicted of two other crimes of domestic violence, but he didn't talk about that at all.  He didn't explain or deny why he sent the photograph of those bloody knuckles to Anthony, he didn't talk about that.  He didn't talk about the prior violence against [A.D.].  He didn't talk about when he slapped her before, when he used that switchblade to threaten her before, he didn't talk about that.

"Because he wants you to believe that he's humble, he wants you to believe he's soft-spoken, he wants you to believe that if I accept responsibility for this one thing where there is absolutely no doubt based on just the physical evidence alone that he committed, if I tell you I did this thing, then I deny all these other things, maybe I'll just get convicted of this thing.  Maybe I can skirt out of here with just one charge, okay."

### B. Applicable Law

The defendant bears the burden of demonstrating ineffective assistance of counsel. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " '[A] defendant claiming a violation of the federal constitutional right to effective assistance of counsel must satisfy a two-pronged showing:  that counsel's performance was deficient, and that the defendant was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'  [Citations.]  Rarely is ineffective assistance of counsel established on appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.)

In determining whether counsel's performance was deficient, we consider whether " ' " 'counsel's representation fell below an objective standard of reasonableness under prevailing professional norms.' " ' " (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) We may reverse " 'only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' " (*People v. Arredondo* (2019) 8 Cal.5th 694, 711 (*Arredondo*).)  Instances in which there is no conceivable tactical purpose for counsel's actions are rare. (*People v. Lopez* (2008) 42 Cal.4th 960, 972.)  However, we "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 (*Strickland*).)

"CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him but fails to do so …, then that evidence may be entitled to added weight." (*People v. Vega* (2015) 236 Cal.App.4th 484, 496 (*Vega*).)  The focus of the instruction, "as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's

failure to explain or deny incriminating evidence in how jurors 'evaluat[e] that evidence,' i.e., the evidence the defendant has failed to explain or deny." (*People v. Cortez* (2016) 63 Cal.4th 101, 118 (*Cortez*); see Evid. Code, § 413 ["In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's failure to explain or to deny by his testimony such evidence or facts in the case against him, or his willful suppression of evidence relating thereto, if such be the case."].)

However, "CALCRIM No. 361 is not to be given every time a defendant testifies." (*Vega, supra,* 236 Cal.App.4th at p. 497.) Rather, CALCRIM No. 361 "applies only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*Cortez, supra,* 63 Cal.4th at p. 117; accord *People v. Saddler* (1979) 24 Cal.3d 671, 680-681 (*Saddler*) [examining substantially similar CALJIC No. 2.62 instruction, and holding instruction must be supported by the defendant's failure "to explain or deny any fact of evidence that was within the scope of relevant cross-examination"].) Because "[t]he instruction acknowledges to the jury the 'reasonable inferences that may flow from *silence*,' " the instruction is not appropriate where the defendant's testimony merely contradicts the People's evidence, nor where the defendant's testimony regarding the evidence seems "improbable, incredible, unbelievable, or bizarre." (*Cortez, supra*, at p. 117.)

## C.    Analysis

Even if we were to assume the instruction was given in error, we would conclude the error was harmless under any standard of review.[3] (*Lamer, supra,* 110 Cal.App.4th at

---

**3**    Although Clark argues the error implicates his constitutional rights and should be evaluated under the harmless beyond a reasonable doubt standard set out in *Chapman v. California* (1967) 386 U.S. 18, courts have routinely applied the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [finding error harmless unless it is reasonably probable that a result more favorable to the defendant would have been

p. 1472 ["courts have routinely found that the improper giving of CALJIC No. 2.62 constitutes harmless error"].) The prosecutor argued the instruction applied to Clark's failure to explain or deny evidence of his prior abuse of B.C. and A.D., the text message to Anthony, and Clark's cleaning of the blinds. This evidence had little, if any, probative value in the context of the entire case, and Clark's failure to address it would have been immaterial to the jury's determination of guilt. Indeed, the jury was instructed, "If the defendant failed to explain or deny, it's up to you to decide the meaning and importance of that failure." Given that Clark admitted to most of the conduct testified to by A.D. and admitted his prior convictions for domestic violence, and given the strength of A.D.'s testimony, we are convinced that this instruction on relatively collateral matters did not contribute to the jury's verdict. (*Saddler, supra,* 24 Cal.3d at pp. 683-684 [finding error harmless in part based on the "strength" of the robbery victim's testimony, despite clear conflicts in the evidence and "little corroborating evidence" of the defendant's guilt]; see also *People v. Haynes* (1983) 148 Cal.App.3d 1117, 1122 [concluding error in giving CALJIC No. 2.62 was harmless, despite conflicting evidence, because the "victim's version of the incident was unequivocal and not inherently improbable"].)

Having concluded Clark was not prejudiced by the instruction, we reject his ineffective assistance claim. (*People v. Memro* (1995) 11 Cal.4th 786, 834, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2; accord, *People v. Price* (1991) 1 Cal.4th 324, 387.) Furthermore, because the instruction was harmless under any standard, we conclude the instruction did not affect defendant's substantial

reached in the absence of the error], when reviewing claims of instructional error pertaining to CALCRIM No. 361 and the equivalent CALJIC No. 2.62. (*Saddler, supra,* 24 Cal.3d at p. 683; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1471 (*Lamer*); *Roehler, supra,* 167 Cal.App.3d at p. 393 [courts have "rather uniformly" applied *Watson*].) We need not resolve this question because the instruction in this case was harmless under either standard.

14.

rights (see *People v. Jimenez* (2016) 246 Cal.App.4th 726, 730), or result in a miscarriage of justice (see *Watson, supra,* 46 Cal.2d at p. 834).

## II.      *Voluntary Intoxication*

Clark contends his trial counsel was ineffective in failing to request an instruction on voluntary intoxication. We conclude Clark has not established ineffective assistance of counsel.

### A.      Applicable Law

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4, subd. (b).) Because intoxication is not a defense to a crime, a trial court has no sua sponte duty to instruct thereon. However, a defendant may request an instruction on voluntary intoxication. (*People v. Saille* (1991) 54 Cal.3d 1103, 1120; see § 29.4, subd. (a).)

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) A defendant is entitled to an instruction on voluntary intoxication " 'only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent" ' " or other mental state specified in section 29.4, subdivision (b). (*People v. Verdugo* (2010) 50 Cal.4th 263, 295; accord, § 29.4, subd. (b).) "The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon." (*People v. Miller* (1962) 57 Cal.2d 821, 830-831.)

**B.      Analysis**

Clark's claim of ineffective assistance of counsel fails because he cannot show he was prejudiced by counsel's failure to request a jury instruction on voluntary intoxication.  (*Strickland, supra,* 466 U.S. at p. 697.)

At trial, the issue of whether Clark's intoxication inhibited his ability to form the requisite intent to commit the crimes was central to the defense.  Clark testified that, on the night of the incident, he consumed "close to a gallon" of liquor and "a handful" of Norcos, in addition to taking other prescription medication and smoking concentrated cannabis.  He claimed there was no specific "thought process" behind his assault on A.D., but that he was lashing out and wanted her to feel the same hurt he was experiencing.  He explained that he was "so drunk and inebriated and really did not know what [he] was doing, just emotions and that's it."  He testified that he continued to drink after his attack on A.D., and he did not come out of the apartment when deputies arrived because he was scared and "wasn't in [his] right state of mind, like [he] didn't really understand how to process everything."

In closing, defense counsel admitted Clark had committed most of the acts testified to by A.D. and was uncooperative with the deputies, but argued Clark was not culpable for the charged offenses because of his mental state.  Indeed, counsel argued that "this whole case is [Clark's] mental state."  Defense counsel seemed to acknowledge that Clark was guilty on count 2 of corporal injury on a spouse, although he also appeared to argue Clark was guilty solely of simple battery, an offense which was not charged to the jury.  However, counsel also argued the evidence of Clark's intoxication indicated Clark "was not thinking straight" and did not have the ability to form an intent.  With regard to count 1, premeditated attempted murder, counsel argued Clark did not intend to kill A.D., and "didn't really have any intent at all, snapped and started hitting her, started hurting her."  He similarly suggested Clark was incapable of intentionally restraining A.D. as

required for the offense of false imprisonment, and incapable of intentionally fighting off the officers in relation to the offense of resisting an officer.**4**

In rebuttal, the prosecutor did not suggest the defense theory of voluntary intoxication did not apply. Rather, she argued the theory was not credible because Clark remembered aspects of the incident, had control over his body and actions, was able to coherently respond to A.D.'s pleas, and took evasive action during the standoff. The prosecutor also argued Clark had a long history of substance use, knew what he was doing, and was able to form the requisite intent.

Based on the foregoing, the jury was well aware that Clark's intoxication could bear on the issue of Clark's intent. The theory of voluntary intoxication was argued to the jury, and nothing in the argument or the instructions limited the jury's proper consideration of this issue.**5** The verdicts reflect that the jury rejected Clark's claim of voluntary intoxication and concluded his ability to form the required intent to commit the offenses was not impaired. There is no reasonable probability Clark would have obtained a more favorable outcome had defense counsel requested, and the jury received, an instruction on voluntary intoxication. (*Woodruff, supra,* 5 Cal.5th at p. 736.)

---

**4** Defense counsel also argued that, due to intoxication, Clark did not have the capacity to act willfully as required to support a conviction for criminal threats. (*People v. Atkins* (2001) 25 Cal.4th 76, 85 [the word willfully generally defines general criminal intent]; § 29.4, subd. (b) [defense of voluntary intoxication applies only to defendant's ability to form specific intent or to premeditate, deliberate, or harbor express malice aforethought].) The prosecutor objected to this argument and her objection was sustained. She later argued intoxication could not absolve Clark of culpability for acting willfully.

The offense of criminal threats requires that the threat be made willfully, and also that the defendant intend his or her statement be understood as a threat. (§ 422.) Voluntary intoxication could undermine this latter specific intent (§ 29.4, subd. (b)), but defense counsel did not argue this point.

**5** The argument was, however, undermined by Clark's own testimony that he intended to hurt A.D.

Because we have concluded Clark was not prejudiced by the lack of instruction, we need not determine whether counsel's performance was deficient. We nonetheless note that an instruction on voluntary intoxication would have added little, if anything, of benefit to Clark's defense. The model instruction on voluntary intoxication informs the jury that evidence of voluntary intoxication may be considered "only in a limited way" to determine whether the Clark acted with a specific intent, premeditation, deliberation, or express malice, and not "for any other purpose." (CALCRIM No. 625.) Given defense counsel's attempt to argue that Clark's intoxication negated his ability to act willfully, counsel may not have wished to call the jury's attention to the limitations of the intoxication evidence. We therefore cannot say counsel had no rational tactical purpose or satisfactory explanation for declining to request the instruction. (*Arredondo, supra,* 8 Cal.5th at p. 711.)

Accordingly, Clark has not established counsel was ineffective in failing to request an instruction on voluntary intoxication.

### III.    *Cumulative Prejudice*

Clark contends the cumulative effect of the two alleged instructional errors was prejudicial. However, to the extent we have assumed error, we have found no prejudice resulted. "The same conclusion is appropriate after considering [the] cumulative effect" of these assumed errors. (*People v. Valdez* (2012) 55 Cal.4th 82, 181.)

### IV.    *Request to Stay the Sentence on Count 2*

Clark contends his sentence on count 2 must be stayed pursuant to section 654 because count 1 (premeditated attempted murder) and count 2 (corporal injury on a spouse) were both part of an indivisible course of conduct. We defer to the trial court's finding that the offenses did not form an indivisible course of conduct, which finding is supported by substantial evidence.

18.

Section 654, subdivision (a) states, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "[T]he statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).) Thus, if the defendant has been convicted of multiple offenses arising out of a single act, he may be punished only once for that act. (§ 654, subd. (a); *Corpening*, *supra*, at p. 311.) Additionally, if the defendant has been convicted of multiple convictions involving multiple acts, but those acts constitute an indivisible course of conduct with a single intent and objective, he likewise may be punished only once for those acts. (*Corpening,* at pp. 311-312.) The temporal proximity of the offenses is not necessarily determinative of whether multiple punishments are prohibited. (*People v. Jackson* (2016) 1 Cal.5th 269, 354 (*Jackson*).) However, "where a course of conduct is divisible in time it may give rise to multiple punishment even if the acts are directive to one objective." (*People v. Louie* (2012) 203 Cal.App.4th 388, 399 (*Louie*).)

The determination of whether the defendant engaged in separate crimes involving separate objectives, or an indivisible course of conduct pursuant to a single objective, is a question of fact for the trial court. (*People v. Brents* (2012) 53 Cal.4th 599, 618.) We will defer to the trial court's factual findings so long as they are supported by substantial evidence. (*Ibid.*; accord, *Jackson, supra,* 1 Cal.5th at p. 354.)

Here, Clark argued in the trial court that the sentence on count 2 should be stayed because the charges of premeditated attempted murder and corporal injury on a spouse were "part of one course of conduct." The People argued section 654 did not apply because Clark's initial attempt to strangle A.D. while telling her he was going to kill her

was separate and distinct from the acts of abuse that followed. The People also emphasized that Clark at one point left the room during the attack, before coming back to assault A.D. again.

The court determined section 654 did not apply:

"While the conduct occurred in one day over a significant period of time, the instances occurred at different times throughout that period, and I think there's a sufficient distinction or definite or separation in the recurrences of the event that support the [section] 273.5 and those facts surrounding the attempted murder that … the [section] 273.5 is not a continuous course of conduct to which Section 654 would apply."

The court's determination is supported by substantial evidence. Clark's attacks on A.D. took place over the course of approximately 45 minutes. After Clark repeatedly choked A.D., he left the room for one to two minutes, before returning and grabbing A.D. by the hair, punching her in the face, and throwing her onto a bedpost. The break in time between the attacks supports the court's ruling. (*Louie, supra,* 203 Cal.App.4th at p. 399; *People v. Lopez* (2011) 198 Cal.App.4th 698, 717 (*Lopez*) [" 'multiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm' "].) The interval between the two attacks provided Clark sufficient time "to reflect upon what he had already done … and what he was about to do." (*Lopez, supra,* at p. 718; accord, *Louie, supra,* at p. 399 ["If the separation in time afforded defendants an opportunity to reflect and to renew their intent before committing the next crime, a new and separate crime is committed."].) This conduct substantially supports the court's determination that the offenses were not part of an indivisible course of conduct.

Clark attempts to analogize this case to other cases that have prohibited multiple punishments. The cases relied on by Clark are inapposite and therefore unpersuasive. One of the cases does not address the application of section 654. (*People v. Carr* (1998) 66 Cal.App.4th 109, 113-115 [discussing dicta from an earlier decision regarding section

20.

654 to conclude a defendant may properly be *convicted* of both burglary and receiving the stolen property he stole during the burglary].)  Additionally, none of the cases involved multiple acts, and thus do not assist us in resolving whether multiple acts committed over a period of time and interrupted by a break constitute an indivisible course of conduct.  (*People v. Jones* (2012) 54 Cal.4th 350, 357 [concluding that the defendant could not be punished for multiple firearm offenses arising out of the possession of a single firearm on a single occasion]; *People v. Atencio* (2012) 208 Cal.App.4th 1239, 1244 [concluding the defendant could not be punished for both theft and possession of the same firearm]; *People v. Islas* (2012) 210 Cal.App.4th 116, 128, 130 [applying the well-established rule that a defendant may not be punished for both a burglary and the intended felony underlying the burglary]; see also *Carr, supra,* at pp. 114-115 [defendant may be convicted of both burglary and receiving the stolen property he stole during the burglary]; accord, *People v. Allen* (1999) 21 Cal.4th 846, 865-867 [citing *Carr* with approval and holding § 654 requires that a sentence for receiving stolen property be stayed, where the defendant also is sentenced for burglary of the same property].)

Here, the court found Clark's acts did not constitute an indivisible course of conduct, and that finding is supported by substantial evidence.  Accordingly, we conclude the court properly declined to stay the sentence on count 2 pursuant to section 654.

## V.      *Sentence on Count 1*

The court sentenced Clark to a term of seven years to life on count 1 for the offense of premeditated attempted murder.

Section 664, subdivision (a) requires that a defendant convicted of premeditated attempted murder be sentenced to a term of life with the possibility of parole.  Although a person sentenced to life with the possibility of parole for premeditated attempted murder is eligible for parole after serving a sentence of seven years in prison (§ 3046, subd. (a)),

the sentence that must be imposed is life with the possibility of parole (§ 664, subd. (a)). The People concede as much. Accordingly, we will order the abstract of judgment corrected to reflect that Clark is sentenced on count 1 to a term of life with the possibility of parole.

## DISPOSITION

The matter is remanded for the court to correct the abstract of judgment to reflect Clark is sentenced on count 1 to a term of life with the possibility of parole. The court shall forward a copy of the corrected abstract of judgment to the appropriate authorities. In all other respects, the judgment is affirmed.

SMITH, J.

WE CONCUR:


FRANSON, Acting P.J.


PEÑA, J.

22.